**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ROGER L. MAXWELL,
               Plaintiff,

                  Case No. 13-10040
      v.               HON. TERRENCE G. BERG

POSTMASTER GENERAL OF THE
UNITED STATES,
               Defendant.

_____/

## OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 32)

Plaintiff Roger L. Maxwell, a former employee of Defendant Postmaster General of the United States, is suing Defendant for gender discrimination and retaliation in violation of Title VII.  On May 21, 2015, Defendant filed this motion for summary judgment.  (Dkt. 32).  Following full briefing, the Court heard oral argument on the motion on October 14, 2015.  For the reasons explained below, Defendant's motion for summary judgment **IS DENIED** as to Count One and **IS GRANTED** as to Count Two.

## I.   FACTUAL BACKGROUND

This is an employment discrimination and retaliation suit.  Plaintiff Roger L. Maxwell, a disabled Air Force veteran, worked for the United States Postal Service (the "Postal Service") from 1987 until his retirement in September 2012.  (Dkt. 32, p. 1).  Somewhere in the late 1990s to early 2000s, Plaintiff rose to the position of Manager of Customer Service ("MCS") at the Bloomfield Hills Town Square Post Office in Bloomfield Hills, Michigan.  (Maxwell Dep., v. 1, Dkt. 32, Ex. 1, 52:03-05).

As an MCS, Plaintiff was a supervisor, responsible for managing numerous mail carriers as well as for ensuring the delivery and collection of mail.  (Dkt. 49, p. 2).

In the broadest terms, Plaintiff claims that the human resources manager[1] for his district, Frances Chiodini, derailed his career over a span of nine years by discriminating against him on the basis of his gender and retaliating against him. The facts relevant to Plaintiff's claims are complicated because, although Plaintiff did not bring the underlying complaint of discrimination until April of 2011, he alleges a long history of purportedly unfair treatment at the hands of certain supervisors, which he believes is relevant to their intent to discriminate.  In order to place Plaintiff's relatively narrow claims in context, a lengthy summary of material events from his employment record with the Post Offices is required.

### A. The EEO Complaints

Plaintiff claims that Chiodini first developed hostility against him because of two EEO actions[2] he participated in during his employment with the Postal Service. The first EEO complaint occurred in 2003 and arose from a female employee's claim of sexual harassment against a male employee.  (Dkt. 32, p. 1).  The female employee asked Plaintiff to accompany her during her interview with the two

---

[1] The Postal Service organizes its individual post offices into various geographic units called "districts."  The districts are organized into larger geographic units called "areas."  The various areas around the country then report directly to Postal Service Headquarters in Washington, D.C.

[2] An "EEO action" is a procedure in which an employes brings a complaint before the Equal Employment Opportunity Commission that charges a violation of the Equal Employment Opportunity
(EEO) Act.

investigators that Chiodini[3] had assigned to investigate her claim.  (Maxwell Dep., v. 1, 7:21-23).[4]

While at the interview, Plaintiff was perturbed when he discovered that one of the two investigators was a woman who had previously brought sexual harassment claims against the same defendant.  (Dkt. 49, pp. 2-3).  Plaintiff, along with his supervisor, Postmaster Hall, then allegedly confronted Chiodini to discuss the issue.  (*Id.*)  According to Plaintiff, the confrontation became heated and embarrassed Chiodini, leading her to harbor animus against him.  (*Id.* at p. 3).  Chiodini states that she does not remember the confrontation with Plaintiff and Don Hall.  (Chiodini Dep., Dkt. 49, Ex. 11, 39:1-10).

The second EEO complaint happened between 2004 and 2005.  In that proceeding, Plaintiff claimed that Jesse Polk, the Post Office Operations Manager ("POOM")[5], wrongfully deprived him of a "far exceeds merit" designation that Plaintiff had received from Hall.  (Maxwell Dep., v. 1, 11:09-12:16).  According to Plaintiff, this designation entitled him to a pay raise.  (*Id.* at 11:17-19).  Plaintiff alleges that Chiodini represented the Post Office in this EEO proceeding.  (Dkt. 55, p. 1).  The case was assigned to EEO Judge Mimi Gendreux, who Plaintiff alleges chastised Chiodini for failing to reach a settlement with Plaintiff on the matter.

---

[3] Plaintiff claims that Chiodini assigned the investigators as part of her duties as manager of human resources.  (Dkt. 49, p. 2).

[4] Plaintiff also claims that Postmaster Don Hall, the Postmaster at Bloomfield Hills and Plaintiff's superior, asked him participate in the 2003 EEO process.  (Dkt. 55, p. 1).

[5] A POOM exercises supervisory functions over postmasters at various post offices.

(Maxwell Dep., v. 1, 12:17-13:06). Plaintiff claims that Judge Gendreux's criticism caused additional embarrassment to Chiodini. (*Id.* at 13:1-6). Chiodini does not remember being chastised by Judge Gendreux, (Chiodini Dep., 44:19-45:6), or even participating in the second EEO proceeding, (Chiodini Dep., 45:19-46:15). Nonetheless, Plaintiff claims that Chiodini's animus grew because of this second proceeding.

### B. After Transferring Plaintiff's Mail Carriers, the Postal Service Sent Plaintiff on Various Details While Maintaining his Position as a Manager of Customer Service.

Until 2004, Plaintiff worked as the MCS at Bloomfield Hills Town Square Post Office supervising mail carriers. This position was at the "EAS[6] Level 20" pay grade. (Maxwell Dep., v. 1, 59:1-11). In 2004, the Postal Service relocated all of the mail carriers from Plaintiff's Town Square Post office—approximately 300 in all—to the Bloomfield Hills Carrier Annex Post Office. (Dkt. 49, p. 3). Because of this transfer of personnel, Plaintiff was left with no carriers to manage. (*Id.*).

After the mail carriers were relocated, Plaintiff was selected to perform several "detail"[7] assignments. From 2004 to 2005, Plaintiff was detailed as a Level

---

[6] The Postal Service's Executive and Administrative Schedule (EAS) determines the pay grade of all non-bargaining employees in "supervisory, professional, technical, clerical, administrative, and managerial positions." Postal Service Employee and Labor Relations Manual, § 411.1, *available at* https://about.usps.com/manuals/elm/elmc4.pdf.

[7] During a detail, an employee is assigned to work in a temporary position that is different from his official position, often at higher pay than the employee's titled position. (Maxwell Dep., v.1, 60:2-7). Importantly, Plaintiff alleges that the Postal Service calculates an employee's retirement benefits based on the salary level of an employee's official position, not on that of any higher paying detail positions. (Dkt. 55, p. 2).

21 Officer in Charge of the Lapeer, Michigan Post Office. (Dkt. 39, p. 2). Following this assignment, Plaintiff spent several years on details at the main post office in Troy, Michigan, first as a Level 22 Officer in Charge and later working with injured employees. (*Id.*) (Although, while on the details, Plaintiff performed the duties of a Level 21 and 22 manager, Plaintiff was not upgraded during these details from his then-current Level 20.)

Although Plaintiff worked on a number of different details from 2004 to 2011, his position as MCS of Bloomfield Hills was never re-classified as "non-authorized" at any time during this period. According to Great Lakes Area[8] human resources analyst Pamela Cunningham, Plaintiff's MCS position "most likely" should have been categorized as "non-authorized" once the mail carriers were removed from the Town Square facility in 2004, because the position's functions had eroded with the removal of the mail carriers. (Cunningham Dep., Dkt. 32, Ex. 3, 13:10-14:7).

As the manager of human resources, Chiodini was responsible for managing the "complement" of employees—the number of authorized positions in each post office within her district. (Chiodini Dep., 53:6-9). Although this was her responsibility, Chiodini states that it was not her practice to re-classify a position until Operations—which she defines as the local postmaster—informed her of the need for a reclassification along with supporting documentation. (*Id.* at 55:7-56:1). According to Chiodini, she did not re-classify Plaintiff's position in 2004 because the

---

[8] Plaintiff's district fell within the Great Lakes Area.

Operations did not tell her that she needed to eliminate Plaintiff's position.  (*Id.* at 56:10-57:5).  She claims that she only learned about the issues with Plaintiff's position sometime between 2005 and 2010 when a "SWIK report"[9] showed that Plaintiff's MCS position was no longer authorized for Bloomfield Hills' Town Square Post Office.  (*Id.* at 58:17-59:1).  Chiodini states that upon learning about Plaintiff's job status, she placed a phone call to the Great Lakes Area and was told over the phone that Plaintiff's status was "nothing to be concerned about" as the district's overall numbers permitted the position.  (*Id.* at 59:8-60:24).[10]

Plaintiff alleges that Chiodini's failure designate his position as non-authorized stemmed from improper motives.  In support of this allegation, Plaintiff points out that Chiodini departed from standard procedures in failing to re-classify his position as non-authorized.  According to Pamela Cunningham, when a position becomes unauthorized at the district level, the district level human resources must inform the area supervisor that the position has become unauthorized.  (Cunningham Dep., 25:1-12).  Moreover, Cunningham declared that she would never advise a district to refrain from re-classifying a position that has become obsolete merely because a district's overall numbers are stable.  (*Id.* at 22:14-20).

---

[9] A "SWIK Report" or Supervisor Work Credit Report, is generated by postmasters in individual post offices to report the number of employees in an office, along with their positions; in addition, the report indicates how many supervisors are authorized at a given post office.  (*See id.* at 69:10-13; Oxie Dep., Dkt. 49, Ex. 8, 40:18-41:5).

[10] Chiodini does not remember who informed her that she did not need to worry about re-classifying Plaintiff's MCS position as "non-authorized."  (Chiodini Dep., 60:25-61:1).

Further, Plaintiff highlights that from 2004 to 2011, various Postal Service employees approached Chiodini regarding the need to adjust Plaintiff's job status. (*See* Viviano Dep., Dkt. 49, Ex. 23, 22:18-24:3) (stating that he discussed Plaintiff's job status with Chiodini more than once between 2004 and 2011); (Don Hall Declaration, Dkt. 49, Ex. 5, pp. 2-3) (stating that following the removal of the mail carriers in 2004, he informed Chiodini that Plaintiff's job needed to be formally eliminated; Hall also states that he requested Chiodini to address Plaintiff's job status "several times over the years between 2004 and 2010 . . . ."); (Joe Spiteri Declaration, Dkt. 49, Ex. 7, p. 3) (declaring that he asked Chiodini numerous times in writing and in person between 2004 and 2010 to attend to Plaintiff's job status); (*see also* Oxie Dep., 56:8-11) ("I'm aware that [Plaintiff] and other postmasters and managers and NAPS reps were telling anybody who would listen at the district that [Plaintiff's] situation needed to be dealt with.").

Despite these alleged attempts to address the lack of clarity regarding Plaintiff's position, Chiodini never reclassified Plaintiff's position as unauthorized from 2004 to 2011.  Throughout this timeframe, Plaintiff continued working on detail assignments while maintaining his official position as a Level 20 MCS—a position that continued to exist on paper although the conditions necessary to justify it had ceased to exist in reality.

### C. Plaintiff Claims that Chiodini Improperly Excluded him from Participating in Postal Service Reductions in Force in 2009 and 2010.

According to Plaintiff, Chiodini not only failed to re-classify his position, she also incorrectly excluded his MCS position from the Postal Service's Reductions in Force ("RIFs")[11] that occurred in 2009 and 2010. (Dkt. 32, p.3; Dkt. 55, p. 5). Plaintiff contends that during a RIF the Postal Service posts positions that are only open to employees included in the RIF. (Dkt. 49, p. 10). Plaintiff sought to have his MCS position included in a RIF because he believed that his veteran status[12] would have entitled him to preferences over non-veteran applicants, thereby enabling him to be promoted to higher-level positions. (*Id.*).

Plaintiff states that he repeatedly asked Chiodini to include his MCS position in a RIF and that Chiodini responded by telling him that she would "explore it."

---

[11] Postal Service ELM § 354.211 defines a reduction in force as a

> [U]niform and systematic way of making organizational changes resulting in the release of an employee from his or her competitive level as defined in 354.217a. A RIF action occurs in the Postal Service when an employee is released from his or her competitive level by separation, demotion, or reassignment requiring displacement. Release from a competitive level must be caused by elimination or significant modification of existing work, creation of new work, reorganization, transfer of function, an individual's exercise of reemployment or restoration rights, or a reclassification of an employee's position based on the erosion of duties that will take effect after a RIF has been formally announced in the employee's competitive area . . . ."

(Postal Service ELM § 354.211, Dkt. 49, Ex. 2).

[12] The parties dispute the nature of the Postal Services' veteran preference. ELM § 354.216(a) states that "[e]mployees who are eligible for a veterans' preference are entitled to a higher retention standing, meaning more seniority, than a nonpreference eligible employee during a RIF." (Postal Service ELM § 354.216, Dkt. 49, Ex. 2). Plaintiff argues that this policy grants preferential treatment to veterans who have been included in a RIF. Defendant claims that the veterans' preference prevents veterans from being included in a RIF in the first place. This dispute is not material to the question before the Court.

(Maxwell Dep., v. 1, 106:22-107:1).[13]  Chiodini recalls discussing a RIF with Plaintiff on only one occasion, where she explained that she could not include him in a RIF because RIFs did not originate at the district level.  (Chiodini Dep., 48:14-21). Further, Chiodini explains she could only include Plaintiff's MCS position in a RIF if the Postal Service's Headquarters decided to eliminate the MCS position on a broad scale (*id.* at 63:2-5; 113:9-114:8).  Cunningham confirms that Headquarters was solely responsible for initiating RIFs (Cunningham Dep., 15:18-20).  Moreover, she claims that district human resources managers do not identify positions or employees to include in a RIF (*id.* at 18:10-13), and cannot simply add non-authorized positions to a RIF, (Cunningham Decl. ¶ 10, Dkt. 32, Ex. 4). Cunningham also adds that Plaintiff's MCS position was not eligible to be part of any of the RIFs that occurred during Plaintiff's employment.  (*Id.*).

Plaintiff disputes Chiodini's account that she was powerless to include him in a RIF and points to Postal Service ELM § 354.213[14] and to testimony from various former Postal Service managers to argue that Chiodini had the authority to decide whether to include Plaintiff in a RIF.  (*See* Viviano Dep., 85:1-4) (stating that it would have been appropriate to include Plaintiff's unauthorized position in the 2009

---

[13] Plaintiff also claims that he repeatedly asked Gabe Viviano, the POOM at the time, to include him in a RIF and that Viviano told him that they were going to "take care of [him]."  (*Id.* at 108:8-20). According to Plaintiff, Viviano reassured him every few months over several years that he would be taken care of.  (Maxwell Dep., v. 2, 25:5-9).

[14] ELM § 354.213 states that "[t]he managers of Human Resources at the district and area levels  . . . are designated as placement administrators.  A placement administrator is responsible for coordinating all RIF avoidance or minimization strategies and placement activities for a competitive area undergoing a RIF."

RIF); (Hall Declaration, p. 3) ("Based on my decades of experience in the Post Office, I believe that Chiodini had the authority and the ability to designate [Plaintiff's] position to be a part of a RIF and to thereby allow him to bid on jobs as an impacted employee."); (Spiteri Decl., p. 3) (stating that Plaintiff "could have and should have been made a part of a reduction in force procedure (RIF) and be allowed to apply for next-level jobs."). Moreover, Plaintiff argues that RIFs could include individual positions at particular Post Offices and did not require the wholesale elimination of a position throughout the entire district. Plaintiff cites as an example the Associate Supervisor Position ("ASP") in the Flint Post Office, where he alleges that only two positions were affected by a RIF while dozens of other ASPs in the district were unaffected. (Dkt. 55, Ex. 8 ) (Postal Service list of impacted positions and employees including only the ASP positions in Flint post offices, but not ASP positions in other post offices).

### D. Plaintiff Claims that Chiodini Undermined his Candidacy for the Rochester Postmaster Position.

In the fall of 2010, Plaintiff interviewed with Gabe Viviano, the POOM, for the postmaster position at the Rochester, Michigan Post Office. (Maxwell Dep., v. 1, 74:1-17). At the time, Plaintiff's wife worked as a clerk at a different post office in Rochester. (*Id.* at 75:21-23). According to Plaintiff, the interview opened with Viviano asking him "what are we going to do about your wife?" (*Id.* at 74:19-21); (Viviano Dep., 69:2-6) (acknowledging that "the very first thing" he discussed with Plaintiff related to his wife's employment). Plaintiff alleges that Viviano stated

10

"Fran, Miss Chiodini, wants to know what we're gonna do about your wife."
(Maxwell Dep., v. 1, 75:13-15).

Plaintiff considered this an inappropriate question because the Postal Service permits spouses to work alongside each other so long as there is at least one degree of supervisory separation between the spouses; a requirement that he claims he would have met in Rochester.  (*Id.* at 76:2-18).  He understood Viviano to be implying that he would only get the job if he compelled his wife to retire or relocate. (*Id.* at 75:10-76:1).

Viviano denies that Chiodini prompted him to question Plaintiff about Plaintiff's wife's job status (Viviano Dep., 69:7-9) and denies that this consideration played any part in the decision not to select Plaintiff for the postmaster position (71:24-72:4).  For her part, Chiodini does not remember speaking with Viviano about Plaintiff's application for the Rochester position.  (Chiodini Dep., 115:18-20). She does recall being concerned about the potential conflict of interest (*id.* at 117:2-118:7) and she remembers addressing this with Viviano—however, she states that she did not know that Viviano raised this concern with Plaintiff at the interview (*id.* at 118:8-20).

Plaintiff believes that Chiodini worked to undermine his candidacy for this position and alleges that other supervisors within the Postal Service informed him that he would have been selected if he had been willing to force his wife to retire. (Maxwell Dep., v. 2, 35:19-23); (Spiteri Declaration, p. 4) (stating that Viviano told

him that if Plaintiff "had answered the question about his wife appropriately he would be Postmaster of Rochester."). Ultimately, one of Plaintiff's former subordinates obtained the Rochester postmaster position. (Maxwell Dep., v. 2, 37:15-16).

### E. Plaintiff alleges that Chiodini Referred to him and other Male Supervisors as the "Boys Club."

Plaintiff also charges that Chiodini referred to him and other male postmasters and supervisors in a derogatory manner based on his gender. Plaintiff states that when he was on detail assignments in Troy, he would attend periodic safety meetings with Chiodini and other postmasters and officers in charge. (Maxwell Dep., v. 2, 55:19-24). At these meetings, Chiodini allegedly referred to the group of male postmasters as the "Boys Club." (*Id.*) Plaintiff perceived that Chiodini used this term in a derogatory manner (*id.* at 115:19-116:1) but did not feel harassed by the comments. (Maxwell Dep., v.1, 123:16-17).

Chiodini denies ever using the expression the "Boys Club" in reference to the male postmasters. (Chiodini Dep., 109:4-14). The record provides support for both accounts. (*See* Viviano Dep., 107:16-20) (stating that he does not remember Chiodini using this term); (*but see* Spiteri Declaration, p. 2) (stating that he remembers Chiodini using this phrase various times in a derogatory and disdainful manner).

F. **The Postal Service Orders that Plaintiff Receive an EAS Grade Level Upgrade but Instead He is Transferred to a Position at the Same Grade Level.**

In November 2010 Chris Oxie, an MCS at the Rochester Carrier Annex Post Office, received an Operations Complement Management Report from the district indicating that Plaintiff's MCS position at Bloomfield Hills Town Square Post Office was due for an upgrade from an EAS Level 20 to Level 21. (Oxie Dep., 32:23-33:23). Oxie was then President of the National Association of Postal Supervisors ("NAPS"), a management association of Postal Service supervisors and managers.[15] That same month, Oxie states that he met with Chiodini in person to discuss upgrading Plaintiff's position. (Oxie Dep., 34:5-35:4). Oxie testified that Chiodini said she would "look into" the upgrade. (*Id.* at 36:22-37:1).

In December 2010, Plaintiff alleges that the Postal Service's Headquarters in Washington, D.C., issued another memorandum,[16] this one directing Chiodini to upgrade two positions: the MCS position in Bloomfield Hills and the MCS position in Troy. (Maxwell Dep., v. 1, 67:7-15). Plaintiff asserts that Headquarters directed the upgrade because of an expected increased workload for both positions. (Maxwell Dep., v. 1, 134:16-122). In addition, Plaintiff points to a December 7, 2010 SWIK

---

[15] NAPS is a management association of 24,000 active and retired Postal Service supervisors and managers that "promotes the prosperity of its members and the Postal Service." *See* http://www.naps.org/index.php/our_association/history_mission/. It is not a union. *Id.*

[16] The Court notes that this memorandum, although Maxwell and Oxie testify that they recall that it was issued, has not been provided in the record. At the same time, Defendant does not contest that such a memorandum was issued.

report indicating that Plaintiff's MCS position was due for an upgrade from a Level 20 to a Level 21. (SWIK Report, December 7, 2010 Dkt. 49, Ex. 10).[17]

After receiving the SWIK Report ordering an upgrade to Plaintiff's position, Oxie again met with Chiodini. (Oxie Dep., 37:9-19). Oxie was surprised that Plaintiff's MCS position—which should not actually have existed any longer—was considered due for an upgrade. (*Id.* at 38:20-23).

On January 18, 2011, Oxie met district officials at the quarterly association meeting between NAPS and the district; a meeting Chiodini and Viviano also attended. (*Id.* at 42:21-43:2). At the meeting, Chiodini allegedly told Oxie that although she had sent the Troy MCS position[18] up to the Great Lakes Area for an upgrade, that Plaintiff's MCS position was not entitled to an upgrade. (*Id.* at 43:3-23). She also allegedly told him that she had just learned that Plaintiff's position was no longer warranted and needed to be formally eliminated. (*Id.* at 44:3-14). Additionally, he claims that Viviano stated that adjusting Plaintiff's job status "fell through the cracks." (*Id.* at 45:2-8).

Under standard procedures for implementing an upgrade, the district human resources office reviews and validates the data in the report and refers it to the Great Lakes Area for review. (Chiodini Dep., 79:11-13). But in Plaintiff's case,

---

[17] The SWIK report contained standard language that required that a post office provide retail services to qualify for an upgrade. (Dkt. 49, Ex. 10).

[18] The Troy MCS position was then occupied by MCS Brenda Ernst. Plaintiff contends that at this time the Troy MCS position, like his own, should have been considered non-authorized as of January 2011.

14

instead of sending Plaintiff's information for an upgrade, Chiodini requested the Great Lakes Area to review the status of Plaintiff's position. Chiodini explains that she decided to scrutinize Plaintiff's position after he approached her about wanting to be included in a RIF (Chiodini Dep., 136:3-14); she does not remember Plaintiff or anyone else asking her to deal with the status of Plaintiff's position until 2010 (*id.* at 137:2-5). Likewise, Chiodini stated that she does not remember requesting that the Great Lakes Area review Plaintiff's MCS position (*id.* at 126:16-22) or ever asking for a similar analysis on another post office or position (*id.* at 137:13-17).

On February 7, 2011, Chiodini sent Cunningham an e-mail titled "Bloomfield Hills Org Structure and Station Mgr." Chiodini asked for Cunningham's findings regarding Plaintiff's MCS position. (Dkt. 49, Ex. 13). Cunningham responded a week later, on February 15, 2011, informing Chiodini that the Bloomfield Hills Town Square Post Office did not qualify for a MCS position and that the position would become "unauthorized." (*Id.*). Cunningham therefore advised Chiodini to determine whether any Level 20 positions were open within commuting distance of Plaintiff in order to reassign him to an authorized position. (*Id.*). Cunningham states that she was not aware that the Bloomfield Hills Town Square Post Office had operated without mail carriers since 2004. (Cunningham Dep., 11:24-12:3).

On February 19, 2011[19], Oxie wrote a letter to District Manager Charles Miller, the Postal Service's head manager for the district. (Dkt. 49, Ex. 9).[20] In the

---

[19] Although the letter is dated January 19, 2011, this appears to be a mistake as it references events that occurred in February 2011.

letter, Oxie expressed shock at Chiodini's statement that she was unaware of Plaintiff's MCS position's status.  Oxie wrote:

> "It is unconscionable to suggest that the District was unaware that the Manager, Customer Service position in Bloomfield Hills did not exist, and only 'discovered it' for the first time in January 2011 coincidently as it is being considered for an upgrade.  The SEM [Southeastern Michigan] District officially stated that the Bloomfield Hills Manager position no longer existed more than seven (7) years after Maxwell left and began to ask that the position be eliminated.  Fran [Chiodini] then stated that if the position came back as no longer authorized, Area would 'tell us what to do.'"

(*Id.* at p. 27).  Oxie then requested that Miller upgrade Plaintiff's MCS position from an EAS Level 20 to an EAS Level 21 and that he include Plaintiff's position in the next RIF.  (*Id.* at 30).

Around the same time, in February 2011, Plaintiff was recalled from his detail in Troy and ordered to return to his original position as an MCS at Bloomfield Hills.  Plaintiff alleges that POOM Jeff Helmuth ordered him to return to his MCS position at Bloomfield Hills Town Square at Chiodini's request.  (Maxwell Dep., v. 1, 66:12-20).  According to Plaintiff, Helmuth approached him saying "[y]ou're not going to believe this, but Fran [Chiodini] has asked me to order, not asked, has ordered me to order you back to your position of record in Bloomfield Hills."  (*Id.* at 67:1-15).  Plaintiff says that he spent a number of days working in his official MCS position before being assigned as the officer in charge of Bloomfield Hills Town Square.  (Dkt. 32, p. 2).

---

[20] Oxie claims that he gave Plaintiff a copy of this letter.  (Oxie Dep., 23:3-5).

Also during this general time-frame, Plaintiff claims that he began a dialogue through email with Chiodini and Viviano asking about whether he would receive an upgrade to his MCS position as well as whether he would be included in the next RIF.  (Maxwell Dep. v. 1, 116:4-14).

On or about March 1, 2011, Plaintiff had a teleconference with Chiodini and Viviano.  Plaintiff questioned Chiodini and Viviano about whether they were going to upgrade his MCS position and whether he would be included in a planned March 25, 2011 RIF.  (Maxwell Dep., v. 1, 85:2-4).  Chiodini and Viviano did not answer Plaintiff's questions, but assured him they would take no actions on his reassignment until they had answered all of Plaintiff's questions.  (*Id.* at 85:4-12).  He claims that they also asked him to put down all of his questions in writing.  (*Id.* 116:4-14).

At some during these communications, Plaintiff was offered reassignment as a Level 20 postmaster in one of three locations: St. Clair, Hazel Park, and Oxford.  (Dkt. 32, p. 4).  Plaintiff maintains that Viviano told him that those offices were mere possibilities but that Plaintiff would not be transferred to any of them because he was going to be upgraded.  (Maxwell Dep., v. 1, 116:22-117:15).

On March 3, 2011, Plaintiff e-mailed Chiodini with a number of questions relating to his position in an e-mail titled "Question's [sic] in regards to MCS position Bloomfield Hills."  (Dkt. 49, Ex. 14).  On March 9, 2011, Chiodini responded "[s]till working on the responses to your questions."  (*Id.*).

17

By letter dated March 7, 2011, Viviano officially reassigned Plaintiff to the St. Clair, Michigan Post Office, some 50 miles or more from Plaintiff's home, as a Level 20 postmaster, effective March 12, 2011. (Reassignment Letter, Dkt. 32, Ex. 6; Maxwell Dep., v. 1, 122:15-18). Plaintiff did not receive an upgrade; the transfer constituted a lateral move with no change in "tenure, grade level or salary."[21] (Reassignment Letter, Dkt. 32, Ex. 6). Prior to transferring Plaintiff, Viviano consulted with Chiodini and determined that Plaintiff was not entitled to an upgrade. (Viviano Dep., 18:7-19). Viviano's reassignment letter directed Plaintiff to report to the St. Clair post office by March 14, 2011.

Plaintiff contends that the reassignment was improper. When Viviano sent the reassignment letter, he was actually away on detail. Another official was serving as acting POOM of the Bloomfield Hills Post Office at that time, but Viviano, who was not the POOM for Bloomfield Hills, made the reassignment decision. (*Id.* at 79:13-80:14). Plaintiff therefore argues that Viviano had no authority to transfer him. Another irregularity, according to Plaintiff, was that Sydney Thomas, the POOM who oversaw the St. Clair post office, did not

---

[21] Had the Postal Service upgraded Plaintiff to a Level 21, he would not have been eligible for a lateral transfer to St. Clair Post Office because only a Level 20 MCS could be considered a lateral transfer to a Level 20 postmaster position. (Sydney Thomas affidavit, Dkt. 49, Ex. 19, p. 276). Plaintiff claims that there were several Level 21 postmaster positions available. It is worth noting, however, that Plaintiff was not seeking to be lateraled to a Level 21 position, he wanted to be upgraded in his current position and then included in the next RIF. (Dkt. 55, p. 5).

participate in the decision to transfer Plaintiff to that office.[22]   (Thompson EEO affidavit, p. 275).   According to Rhonda Wright, Viviano's replacement following his retirement, a POOM cannot unilaterally transfer an employee to a post office outside of their area.

Immediately following the transfer notice, rather than reporting to the St. Clair Post Office as ordered, for reasons that are never explained, Plaintiff was assigned to begin a detail as the officer-in-charge of Troy.   He never reported to St. Clair.   (Dkt. 32, p. 5).   On March 25, 2011, the Postal Service conducted another RIF in which Plaintiff's position was not included.   (*Id.*).   Along with the RIF, Plaintiff claims that the Postal Service instituted a pay freeze.   (*Id.*).   On September 30, 2012, Plaintiff retired from the Postal Service through exercising an "early out" option.   Plaintiff maintains that he chose the early retirement because of health problems and stress from Chiodini's alleged interference with his career.   (*Id.* at 5-6); (Dkt. 55, p. 6).

### G. Plaintiff Claims that a Similarly Situated Female Employee Received an Upgrade and a Transfer to a Higher Level Position.

As described above, the December Memorandum ordered the upgrade of two MCS positions, Plaintiff's MCS position in Bloomfield Hills and Brenda Ernst's MCS position in Troy.   Troy, Michigan hosts two post offices: the main post office ("Troy Main Office") located on Big Beaver Road and Livernois Avenue, and the

---

[22] The Detroit district, which encompasses the Bloomfield Hills post office, is subdivided into different areas.   POOMs are only responsible for overseeing their assigned areas.   Bloomfield Hills and St. Clair are part of different areas within the Detroit district.

older post office facility on Bellingham Road ("Troy Bellingham Office."). (Maxwell Dep., v. 1, at 69:11-14).

In a desire to consolidate operations, sometime in 2010, district management moved all of the carriers and clerks from the Troy Main office to the Troy Bellingham office while retaining retail services at the Troy Main office. (*Id.* at 69:14-18). The Troy Bellingham office never provided retail services. (Ernst Dep., 22:22-25). Prior to the consolidation, Brenda Ernst was a Level 20 MCS at the Troy Bellingham office, where she managed two units of carriers. (Ernst Dep., 19:13-19). For two and a half years, Ernst managed these carriers alone since no postmaster or officer in charge was present at the Troy Bellingham office. (*Id.* at 25:24-27:7). The consolidation resulted in the addition of about three additional units of mail carriers to the Troy Bellingham office. (*Id.* at 19:13-19).

The consolidation also caused the transfer of Plaintiff, who had been detailed as the officer in charge of Troy Main Post Office, to that same position at the Troy Bellingham office. (Maxwell Dep., v. 1, 69:20-24). Since there was now a postmaster or officer in charge at the Troy Bellingham office, at least as of December 2010, Ernst's MCS position became superfluous. (Maxwell Dep., v. 2, 75:22-76:9); (Ernst Dep., 27:5-28:5) (stating that it was not necessary to have both a MCS and a postmaster in the same facility). However, for six months, Ernst continued working at the Troy Bellingham office as an MCS despite the presence of a postmaster in the facility. (Ernst Dep., 26:23-27:5). During this time, Ernst was

essentially performing the same functions as the postmaster. (Maxwell Dep., v. 2, 77:5-8). Plaintiff, therefore, subsequently informed Ernst that her position was no longer necessary. (Ernst Dep., 29:20-30:3).

After the consolidation, in December 2010, the Postal Service released the upgrade memo ordering the upgrade of Plaintiff's and Ernst's MCS positions from a Level 20 to a Level 21. (Maxwell Dep., v. 2, 76:5-10). The upgrade required that the Level 21 MCS work in a post office with retail services. However, the Troy Bellingham post office did not provide retail services. (Dkt. 49, Ex. 10); (Chiodini Dep., 78:1-3) (noting that "units without retail operations [rate] one row below the point range . . . ."). Nevertheless, the Postal Service upgraded Ernst's MCS position to a Level 21 on February 12, 2011, (Dkt. 32, p. 3). Unlike what Chiodini did when she received notification to upgrade Plaintiff's MCS position, Chiodini did not request additional scrutiny of Ernst's position to determine if Ernst qualified for an upgrade. (Chiodini Dep., 128:24-129:1). After her upgrade to Level 21, Ernst was eventually lateraled to a Level 21 postmaster position in Birmingham, Michigan. (Ersnt Dep., 32:4-12). However, Ernst remained working as a Level 21 MCS at the Troy Bellingham office—a location which allegedly should not have supported an MCS – until October 2011. (*Id.* at 32:22-24).

## II. PROCEDURAL HISTORY

Plaintiff brought suit on January 4, 2013. (Dkt. 1). The Complaint was amended on July 30, 2013 to contain two counts under Title VII: (1) gender

discrimination and (2) retaliation. (Dkt. 12). On December 10, 2013, the Court granted in part and denied in part Defendant's motion to dismiss Plaintiff's complaint. (Dkt. 21). In that order, the Court explained that a plaintiff may not bring a Title VII discrimination suit in federal court without first timely pursuing EEO administrative remedies, including EEO counseling. If an employee fails to seek EEO counseling within the timeframes required by the EEO process, that is grounds for dismissal of a plaintiff's discrimination claims. (*Id.* at p. 5) (citing *Hunter v. Sec. of U.S. Army*, F.3d 986, 993 (6th Cir. 2009)). Under 29 C.F.R. § 1614.105(a)(1), an aggrieved federal employee must initiate contact with an EEO Counselor within 45 days of the date of the matter alleged to be discriminatory, or in the case of personnel action, within 45 days of the effective date of the action in order to facilitate informal resolution of the dispute. Since Plaintiff first made contact with an EEO counselor on April 25, 2011 (Dkt. 14, Ex. A), any claims based on conduct that happened before March 12, 2011 (45 days before Plaintiff's contact with the EEO counselor), were time-barred. (*Id.* at p. 7).

On May 21, 2015, Defendant moved for summary judgment. (Dkt. 32). The parties have fully briefed this motion and the Court heard oral argument on October 14, 2015. (Dkt. 54).

# III. ANALYSIS

## A. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. S*ee Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

"As the moving parties, the defendants have the initial burden to show that there is an absence of evidence to support [plaintiff's] case." *Selhv v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "'may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009)).

## B. Discussion

Plaintiff claims that Defendant engaged in two violations of Title VII:  (1) gender discrimination and (2) retaliation.  The Court will discuss each alleged violation in turn.

### 1.  Plaintiff's Gender Discrimination Claim

Where there is no direct evidence of discrimination, Title VII discrimination claims are subject to the *McDonnell Douglass* burden-shifting tripartite framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).  "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal quotation marks omitted).  "Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.* at 253.

### a.  Step One: Plaintiff's Prima Facie Case of Gender Discrimination

To establish a prima facie case of gender discrimination, a plaintiff must show that (1) he was a member of a protected class; (2) he suffered an adverse

employment action; (3) was qualified for the position; and (4) was treated differently from similarly situated members of the unprotected class. *Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451, 456-57 (6th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "The prima facie requirement for making a Title VII claim is not onerous, and poses a burden easily met." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (internal citations and quotation marks omitted).

As the parties disagree as to the applicability of all four factors, the Court will address each factor in turn.

### (i) Member of a protected class

Because he is a male, Plaintiff's gender discrimination claim constitutes a "reverse discrimination" claim. In these types of claims, "a plaintiff satisfies the first prong of the prima facie case by demonstrating background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004) (internal quotation marks and punctuation omitted). "This requirement is not onerous, and can be met through a variety of means, such as statistical evidence; employment policies demonstrating a history of unlawful racial considerations; evidence that the person responsible for the employment decision was a minority; or general evidence of ongoing racial tension in the workplace." *Johnson v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 502 F. App'x 523, 536

25

(6th Cir. 2012). There is no "bright line" test for determining whether "background circumstances" exist to support a suspicion of reverse discrimination. *DeBiasi v. Charter Cty. of Wayne*, 537 F. Supp. 2d 903, 916 (E.D. Mich. 2008).

While no bright line rules exist, the Sixth Circuit has cautioned courts to guard against imposing too high a standard in analyzing the "background circumstances" prong. *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002) ("we note that the 'background circumstances' prong, only required of 'reverse discrimination' plaintiffs, may impermissibly impose a heightened pleading standard on majority victims of discrimination.") (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 n. 7 (6th Cir.1994)) (stating "[w]e have serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are white or male than for their non-white or female counterparts."). Thus, courts should tread carefully where the "background circumstances" prong could be "the difference between granting and denying summary judgment." *Id.* at 257.

Defendant contends that Plaintiff falls short of showing the necessary "background circumstances" to infer that Plaintiff's transfer to the St. Clair Post Office constituted reverse discrimination. Defendant points out that Viviano, a male, made the transfer decision and further that Plaintiff has failed to provide any other basis for finding "background circumstances" of discrimination like statistical evidence or biased employment policies.

Plaintiff counters by relying on the "Cat's Paw" theory to argue that it was Chiodini, a woman, who was actually responsible for the decision to transfer him to St. Clair and concomitantly deny him an upgrade to Level 21.[23]  The Cat's Paw theory holds that "if a supervisor performs an act motivated by [discriminatory] animus that [1] is intended by the supervisor to cause an adverse employment action, and [2] if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

"Under traditional tort law, 'intent' . . . denote[s] that the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it."  *Id.* at 422 n.3.  Thus, in *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 352 (6th Cir. 2012), the Sixth Circuit held that a human resources manager exhibited discriminatory intent where he lied to decision makers in order to bring about the plaintiff's termination.

---

[23] As a threshold matter, Plaintiff may correctly raise Chiodini's past actions as evidence of her intent to discriminate against him.  Defendant complains that Plaintiff is improperly inserting time-barred claims into the transfer decision.  However, employees can rely on time-barred actions or conduct "as background evidence in support of a timely claim."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also Clack v. Rock-Tenn Co.*, 304 F. App'x 399, 403 (6th Cir. 2008) ("Here, Clack is not attempting to recover based on Murphy's past statements but, as explicitly allowed by Morgan, is simply using them as background evidence to prove pretext."); *Gibson v. Shelly Co.*, 314 F. App'x 760, 767 (6th Cir. 2008) (holding that the plaintiff could use time-barred evidence in supports of his discrimination and retaliation claims).  Here, Plaintiff may not argue that Chiodini's past conduct constitutes separate adverse employment actions that could be considered substantive violations.  However, Plaintiff may rely on evidence of Chiodini's past actions to support his claim that Chiodini intended to discriminate against him when she caused his transfer to the St. Clair Post Office without upgrading his position.

Here, the record supports a finding that Chiodini treated Plaintiff differently from a similarly situated employee by singling out Plaintiff's MCS position for additional scrutiny in February 2011—a kind of scrutiny Chiodini cannot recall ever requesting for other employees due for upgrades.  That Chiodini allegedly acted with discriminatory intent in treating Plaintiff differently may be inferred from the fact that Chiodini did not such request scrutiny for Brenda Ernst, the other MCS due for an upgrade, as she did for Plaintiff.  Chiodini treated them differently—even though there were serious questions as to whether Ernst's position, like Plaintiff's, should have then been considered non-authorized, and therefore as ineligible for an upgrade as Plaintiff was found to be.[24]  Plaintiff points to the following actions as further support for a finding of discriminatory intent.  He claims that Chiodini:

- referred numerous times to Plaintiff and other male supervisors as the "Boys Club," a term that Plaintiff and Spiteri considered derogatory;

- failed to re-classify Plaintiff's MCS position as non-authorized from 2004 until 2011 (when finally directed to do so) despite multiple inquiries by Plaintiff, Viviano, Hall and Spiteri about the status of Plaintiffs' position, and even though, according Pamela Cunningham, such inaction in reclassifying Plaintiff's position deviated from standard procedures;

---

[24] The record raises questions about whether Ernst's MCS position should have been considered un-authorized because a postmaster had been assigned to her post office, making her MCS position redundant.  Further, Ernst's post office did not offer retail services—a requirement for an upgrade.

28

- acted to undermine Plaintiff's candidacy for the Rochester postmaster position by allegedly allowing inappropriate questions about Plaintiff's wife, and his answers thereto, to be used as basis for denying him the position;

- excluded Plaintiff's position from the RIFs that took place during 2009 and 2010.[25]

Considering the record evidence before the Court, Plaintiff has raised a question of fact as to whether Chiodini treated him differently from Ernst and intended to discriminate against him.

Next, Plaintiff must show that Chiodini's act was the proximate cause of the decision to transfer him without first upgrading him. To show proximate causation, "the intermediate employee's actions need not be the sole cause of the adverse action . . . it is common for injuries to have multiple proximate causes." *Chattman*, 686 F.3d at 352. "Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect." *Staub*, 562 U.S. at 419 (internal quotation marks and punctuation omitted). Further, "a biased employee's 'position [of] influence' is probative of that employee's ability to influence the ultimate decisionmaker." 686 F.3d at 353. Thus, in *Chattman* the Sixth Circuit held that there was a question of fact as to proximate causation where a biased human

---

[25] There is a dispute of fact on the question whether Chiodini had the authority to include Plaintiff in a RIF. Defendant contends that RIFs are only applicable on a class-wide basis, as directed by headquarters. According to multiple former Postal Service managers, including Viviano, Hall and Spiteri, a manager like Chiodini had the power to include Plaintiff in a RIF.

resources manager participated in discussions of disciplining an African American employee. *Id.*

As in *Chattman*, here Chiodini was the human resources manager and held a position of influence in the decision to transfer Plaintiff to the Level 20 postmaster position in St. Clair, as opposed to possibly upgrading Plaintiff to a Level 21 MCS and then transferring him to an appropriate position. Chiodini requested additional scrutiny of Plaintiff's position and told Viviano that Plaintiff was not eligible for an upgrade. Viviano relied on this information in deciding to transfer Plaintiff to St. Clair. (Viviano Dep., 18:7-19). Under these circumstances, Plaintiff has sufficiently alleged that under the Cat's Paw theory, Chiodini was responsible for the decision to transfer him rather than to upgrade him.

Thus, mindful of the Sixth Circuit's warning not to make the "background circumstances" prong too onerous a requirement, the Court finds that Plaintiff has made a prima facie showing of "background circumstances" supporting his claim of discriminatory intent.

(ii) <u>Adverse Employment Action</u>

Discrimination under Title VII requires that an adverse action be "materially adverse[.]" *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002). "Employment actions that are *de minimis* are not actionable under Title VII." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en

banc) (emphasis in original); *see also Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) ("stern words" are not materially adverse actions).

"A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, *or other indices that might be unique to a particular situation*." *Ford*, 305 F.3d at 553 (citing *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)) (emphasis added).

Defendant argues that Plaintiff's prima facie claim must fail because Plaintiff only complains about his March 12, 2011 transfer to St. Clair, a transfer that did not involve a change in "tenure, grade level, or salary."  (Dkt. 32, Ex. 6.)  Case law is clear that "reassignment without changes to an employee's salary or work hours is normally not considered an adverse employment action."  *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (citing *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987); *Russell v. Drabik*, 24 F. App'x 408, 410 (6th Cir. 2001).  Plaintiff counters that he did not find out that he would not be upgraded until March 12, 2012, when he found out about the transfer.

As explained in this Court's prior order, for a discrimination claim to be timely, a plaintiff must contact an EEO counselor within 45 days of the alleged

discriminatory action.  Here, Plaintiff did not did not contact an EEO counselor until April 25, 2011, which was 44 days after he received formal notice of his transfer, on March 12, 2011.  Any claims relating to allegedly discriminatory conduct that occurred before March 12, 2011 would therefore be time-barred.

Thus, the key question is whether Plaintiff learned of Defendant's decision not to upgrade him before his transfer on March 12, 2011, or whether he learned of this decision contemporaneously with his receipt of the reassignment letter. Defendant argues that because headquarters released the upgrade memo in November or December 2010, the upgrade decision occurred before March 12, 2011 and is thus time-barred.  This is unpersuasive because it only relates to when the position became eligible for an upgrade, not when Defendant informed Plaintiff that he would not receive an upgrade.

The Court turns to the record to determine this question. On February 7, 2011, Chiodini e-mailed Pamela Cunningham asking her to scrutinize Plaintiff's eligibility for an upgrade.  Cunningham responded on February 15, 2011, stating that Plaintiff's position should be considered non-authorized—and thus not eligible for an upgrade—because he no longer had carriers to manage as the MCS of Bloomfield Hills.  Thus, the available record supports the conclusion that prior to February 15, 2011, the Postal Service had not yet made any final decision on whether to upgrade Plaintiff's position.

32

On February 16, 2011, Oxie reports that Chiodini called to tell him she had coded Plaintiff's MCS position as non-authorized because Plaintiff no longer managed mail carriers at Bloomfield Hills Town Square. (Oxie Letter v. 2, Dkt. 49, Ex. 9, p. 26.) According to Cunningham, once a position becomes non-authorized, it is no longer eligible for an upgrade. (Cunningham Declaration, Dkt. 32, Ex. 5.) On February 19, 2011, Oxie wrote a letter to Charles Miller, the head manager for the district, asking him to upgrade Plaintiff. (Oxie Letter v. 2, Dkt. 49, Ex. 9 at p. 30). Oxie claims that he gave Plaintiff a copy of this letter (Oxie Dep., 23:3-5) but there is nothing in the record confirming that Plaintiff received this letter or that Plaintiff understood from this letter, or from any other source, that as of February 19, 2011 the decision had been made that he would not be upgraded. Plaintiff was not asked if he received Oxie's letter, and maintains in any event that he was not aware that the upgrade decision had been decided against him until he received his transfer letter on March 12, 2011.

Around this same time, mid-February 2011, Plaintiff was briefly recalled to his job as MCS of Bloomfield Hills and then later placed on detail as the Officer in Charge of Bloomfield Hills. During this time, Plaintiff says he had various communications about the upgrade issue with Chiodini and Viviano. (Maxwell Dep., v. 1, 116:4-14).

On March 1, 2011, Plaintiff had a teleconference with Chiodini and Viviano where they discussed the upgrade and Plaintiff's desire to be included in the next

RIF.  (*Id.* at 85:4-13).  Plaintiff testified that he had many questions, and that Viviano and Chiodini told him that no action would be taken regarding his position until all of his questions were answered.  (*Id.*)  Chiodini acknowledges that Plaintiff asked her many questions that neither she nor Viviano were able to answer (Chiodini Dep., 112:10-14) but she does not remember exactly what was discussed (*id.* at 113:7-9).

On March 3, 2011, Plaintiff wrote Chiodini an email containing a series of questions.  In the email, Plaintiff wrote that he had "never been officially notified in writing that my position EAS-20 in Bloomfield Hills has been eliminated."  (Dkt. 49, Ex. 14) (emphasis added).  On March 9, 2011, Chiodini responded that she was still working on responses to his questions.

There is no evidence that Chiodini ever provided responses to Plaintiff's questions.  By letter dated March 7, 2012, Viviano reassigned Plaintiff to St. Clair. Prior to deciding to reassign Plaintiff, Viviano consulted with Chiodini about whether Plaintiff was entitled to an upgrade.  (Viviano Dep., 17:23-18:14). Ultimately, "a decision was made that [Plaintiff] was not entitled" to an upgrade because his MCS position had been eliminated.  (*Id.* at 18:11-14).  However, there is no evidence that either Chiodini or Viviano informed Plaintiff that the decision had been made that he would not receive an upgrade at any time before Plaintiff received the reassignment letter.  And Plaintiff states that he only learned that he

34

would not receive an upgrade when he received the reassignment letter to the Level 20 position in St. Clair.

In light of the available evidence in the record, Plaintiff's claim that he was denied an upgrade based on age discrimination is not time-barred because there is no evidence that Plaintiff was informed of this decision any time before March 12, 2011.  Because Plaintiff filed his EEO complaint on this issue within 45 days of March 12, 2011, it is timely.

Having decided that Plaintiff's claim regarding the upgrade decision is timely, the Court now considers whether it constitutes an adverse action.  There is no question that the decision to deny Plaintiff an upgrade resulted in a loss of salary and (obviously) a grade level.  The Court therefore holds that the decision not to upgrade Plaintiff was an adverse action.  *See Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002).  Therefore, Plaintiff has made a prima facie showing of this factor.

(iii)   <u>Plaintiff was Qualified</u>

"At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc) (emphasis in original).  "The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for

employment in the relevant field.  Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills."  *Id.* at 575-76.

This factor is clearly met here.  Plaintiff was qualified to be a Level 21 MCS. From 2004 to 2011, Plaintiff worked on various details as an officer in charge—a higher position than an MCS—at the Level 21 and Level 22 grade levels.  It follows that Plaintiff was apparently treated by the Postal Service as qualified to be a Level 21 MCS based on his experience and skill set.

(iv)    <u>Similarly Situated</u>

"In order for two or more employees to be considered similarly-situated for purposes of creating an inference of disparate treatment in a [reverse discrimination case], the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [female employee] who he alleges [was] treated more favorably."  *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).

Relying on *Russell v. Drabik*, 24 F. App'x 408, 412-13 (6th Cir. 2001) (internal quotation marks omitted) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992), Defendant argues that the "similarly situated" standard is onerous, and requires a plaintiff to show that they "dealt with the same supervisor, have been

36

subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

This argument is not well-taken. In a published opinion, the Sixth Circuit has explained that the *Mitchell* factors cited in *Russell* are generally relevant considerations in the disciplinary context, but that courts "should not assume . . . that the specific factors discussed in *Mitchell* are relevant under different circumstances . . . .". *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352-53 (6th Cir. 1998) (explaining that reading *Mitchell* too narrowly would undermine the "remedial purpose of the anti-discrimination statutes.").

Therefore, a Plaintiff does not need to show "an exact correlation" with the employee that was alleged to have received more favorable treatment. *Id.* Rather, a plaintiff must only show that he or she was similarly situated in "all of the *relevant* aspects." *Id.* (emphasis in original) (internal quotation marks omitted).

Plaintiff has made a prima facie showing that he was similarly-situated to Brenda Ernst in all relevant respects.[26] Plaintiff and Ernst had the same official position (MCS) and the same grade level (Level 20). Plaintiff, although on detail, continued to hold the position of MCS despite the fact that the Postal Service likely should have categorized his position as non-authorized because his MCS duties no longer existed at the Bloomfield Hills Post Office. As for Brenda Ernst, the record

---

[26] As for Debra Pummer, the Court agrees with Defendant that Plaintiff was not similarly situated to Pummer, a Diversity Development Specialist who had different job tasks and supervisors.

37

shows that for two and a half years, she worked as the MCS at the Troy Bellingham office without a postmaster in her office.  (Ernst Dep. 24:24-27:7).  After the consolidation of two Troy post offices, in 2010, the Postal Service transferred a postmaster to the Troy Bellingham office, making Ernst's MCS position superfluous.  (*Id.* at 27:5-28:5).  Thereafter, Ernst continued to work as an MCS although her position, like Plaintiff's, should probably have been categorized as non-authorized.

Further, it was only after the consolidation in Troy had taken place that the upgrade memorandum was issued directing the upgrade the MCS positions.  Therefore, both Plaintiff's and Ernst's MCS positions were arguably unauthorized when the directive came out to upgrade their positions.  While the record shows that Chiodini on February 7, 2011 asked for Plaintiff's position to be scrutinized to see whether his non-authorized MCS position was eligible for an upgrade, it also shows that Chiodini submitted Ernst's MCS position for an upgrade, and Ernst received her upgrade from a Level 20 to Level 21 MCS on February 12, 2011.  Moreover, the record suggests a second reason why Ernst's position did not qualify for an upgrade: the Troy Bellingham Post Office did provide retail services.  Nevertheless, Chiodini did not send Ernst's position for further scrutiny as she did with Plaintiff.

Lastly, to the extent that Defendant complains that Plaintiff's position should have been categorized as non-authorized as long ago as 2004, while Ernst's position

was justified until sometime in 2010, the Court notes that Defendant created this situation. Had Defendant properly categorized Plaintiff's position between 2004 and the 2010, Plaintiff would not have remained in a non-authorized MCS position. Since Defendant failed to do so, both Plaintiff and Ernst were in similar positions at the time the 2010 upgrade memorandum was issued: both held MCS positions that likely should have been previously categorized as non-authorized. Yet, only Maxwell received additional scrutiny while Ernst received an upgrade. Plaintiff has therefore satisfied the fourth element and established a prima facie case of gender discrimination.

(v) <u>Pretext</u>

"Pretext may be established either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *White*, 533 F.3d at 392-93 (internal quotation marks omitted) (citing *Burdine*, 450 U.S. at 256)). "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Id.* at 393.

Defendant claims that it transferred Plaintiff to St. Clair in order to keep him gainfully employed and did not upgrade Plaintiff because his position was non-authorized. Plaintiff claims that the decision to transfer him without upgrading

him first was highly irregular and that the government's proffered reason was not the actual reason for the decision. Having extensively reviewed the record, the Court holds that the evidence raises a question of fact as to whether Defendant's proffered justification—keeping Plaintiff employed even though his position was non-authorized—actually drove its decision to transfer Plaintiff without first upgrading him.

For the foregoing reasons, Defendant's motion for summary judgment **IS DENIED** as to Count One.

### 2. Plaintiff's Title VII Retaliation Claim

"When an employee alleges that an employer has both discriminated and retaliated against him in violation of Title VII, the district court must analyze these claims separately under Title VII, as the elements (and standards) for each claim are distinct." *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014). Like discrimination cases, retaliation claims based on circumstantial evidence are subject to the *McDonnell Douglas* burden-shifting framework. *Id.* at 730. Thus, Plaintiff must first present a prima facie claim, which then shifts the burden to Defendant to "articulate some legitimate, non-discriminatory reason for its actions" followed by an opportunity for Plaintiff to "demonstrate that Defendants' proffered reason was not the true reason for the employment decision." *Id.*

"The elements of a retaliation claim are similar but distinct from those of a discrimination claim. To establish a prima facie case of retaliation under Title VII,

Plaintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Id.* (internal quotation marks omitted).

Plaintiff participated in two EEO actions while employed at the Postal Service. In 2003, Plaintiff accompanied one of his female employees in her EEO claim for sexual harassment against a male employee. Then, between 2004 and 2005, Plaintiff filed his own EEO claim against POOM Jesse Polk over the denial of a merit designation. Defendant concedes that Plaintiff's 2004-05 EEO against Polk constitutes protected conduct but argues that Plaintiff's 2003 involvement in his female employee's EEO proceeding was not protected conduct. Even accepting Plaintiff's assertion that both his assistance to his employee's 2003 EEO and his own 2004 to 2005 EEO constitute protected conduct, the Court concludes that Plaintiff cannot establish a prima facie claim of retaliation.

Plaintiff's retaliation claim must fail because he is unable to establish causation between his protected activity and the allegedly retaliatory transfer. "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the

41

employer.'" *Id.* at 731.  Here, Plaintiff last engaged in protected conduct between 2004 and 2005.  The transfer, however, occurred *six years* later, on March 12, 2011.

Courts do not draw an inference of causation where the protected conduct happens long before the alleged retaliation.  *See Plumb v. Potter*, 212 F. App'x 472, 482 n.6 (6th Cir. 2007) ("[S]ix years is . . . too long to permit an inference of causal connection."); *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000) ("previous cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months.").

The record shows that in the months and years following Plaintiff's 2004 to 2005 EEO, Chiodini took no adverse action to re-classify Plaintiff's moribund MCS position as unauthorized.  Arguably, this worked in Plaintiff's favor, because the position was allowed to remain on the books from 2004 until 2011.  It was only after the upgrade directive—not Plaintiff's EEOs—that Chiodini took an interest in examining Plaintiff's position.  Therefore, the evidence is insufficient to raise any genuine issue of material fact on the question of whether Plaintiff's 2005 EEO was the "but for" cause of his transfer to St. Clair.  All the evidence in the record suggests it was not.  Therefore, Plaintiff fails to establish a prima facie claim of retaliation.  For these reasons, Defendant's motion for summary judgment is thus **GRANTED** as to Count Two.

## IV. CONCLUSION

For the reasons explained above, the Court holds that Defendant's motion for summary judgment **IS DENIED** as to Count One and **IS GRANTED** as to Count Two.

**SO ORDERED.**


Dated:  February 8, 2016                          s/Terrence G. Berg
                                                  TERRENCE G. BERG
                                                  UNITED STATES DISTRICT JUDGE


### Certificate of Service

I hereby certify that this Order was electronically submitted on February 8, 2016, using the CM/ECF system, which will send notification to all parties.

                                                  s/A. Chubb
                                                  Case Manager